IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RODNEY SCHUMAN,

    Plaintiff,

v.

IKON OFFICE SOLUTIONS, INC., ET AL.,

    Defendants.

No. C 03-4976 MJJ

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Before the Court is Defendant IKON Office Solutions, Inc.'s ("Defendant" or "IKON") Motion for Summary Judgment. Plaintiff Rodney Schuman opposes the motion. The Court heard oral argument on Defendant's motion on May 3, 2005. For the following reasons, the Court **GRANTS** Defendant's Motion.

## FACTUAL BACKGROUND

Plaintiff Rodney Schuman ("Plaintiff") was hired by Defendant IKON (or its predecessors) in 1973. He became a Major Account Executive ("MAE") in 1987. As such, he was responsible for selling office equipment and professional services to businesses. According to his job description, Plaintiff was responsible for, *inter alia*: "manag[ing] territory by protecting and increasing a profitable revenue stream within current accounts." (Reply Declaration of Jennifer Cooke ("Cooke Reply Decl."), Ex. A.)

1    IKON's MAEs are paid according to a written compensation plan, generally issued each fiscal year.[1] They are paid a base salary, sales commissions, and bonuses. The compensation plan in effect from October 1, 2001 to September 30, 2002, states:

> Nothing in the Plan shall be construed as a contract of employment or as altering a Sales Representative's "at-will" employment status with the Company. The Company and the Sales Representative acknowledge and agree that they are both free to terminate such employment at any time for any reason. IKON has the right to change, cancel, expand or reduce the size, scope and type of any territory assignments to Sales Representatives at any time for any reason.

(Declaration of Jeremy Naftel ("Naftel Decl."), Ex. E at 62.) In the compensation plan's glossary, the "Territory Integrity" entry explains that the code of territory integrity applies to "Sales Representatives who sell in another's territory, whether that territory is a geographical assignment or on a Major Account List . . . ." (*Id*., Ex. E at 55–60 (emphasis added).) According to the plan, if a sales representative is terminated, "whether by resignation or discharge, and whether with or without cause, compensation for deals where the customer has been invoiced, but not paid at the time of the employee's termination will be paid to the Sales Representative following termination." (*Id*. at 61.) Similar compensation plans, containing similar language, were in effect for FY 2003 and FY 2004. Plaintiff acknowledges that these plans governed his compensation from October 2001 through September 30, 2004, that he read the plans and had the opportunity to ask questions about the plans, and that he signed a statement acknowledging that he would not be paid outside the terms of the plans. (Deposition of Rodney Schuman ("Schuman Depo.") at 309:12–310:6, 339:16–20.)

Prior to April 2000, Plaintiff was assigned to IKON's West Bay Marketplace division in San Francisco. Among Plaintiff's accounts were the McKesson account and the Chevron account. On the McKesson account, Plaintiff's point of contact was Brenda Peach, McKesson's Director of Corporate Procurement. After Chevron moved to San Ramon, California, which was located in a different geographical division of IKON, Plaintiff decided to transfer to that division so that he could continue to service the Chevron account. IKON had a policy of requiring sales representatives to focus on accounts located within their own Marketplace. Plaintiff was permitted to retain the McKesson account, which was located in the West Bay Marketplace, for a transition period. He

---

[1] IKON's fiscal year runs from October 1 through September 30.

2

reported separately on that account to Bill Crowley, Strategic Accounts Sales Manager.

In 2000, IKON negotiated a three-year nationwide contract with McKesson's subsidiary, HBOC, to provide all of the subsidiary's copy service and equipment needs. Steve Henderson, IKON's National Account Manager, and IKON's national sales team, known as INAP, of which Plaintiff was not a part, negotiated the contract with Patricia Davis, HBOC's Facility Manager. Once the contract was signed, Davis became Senior Facility Manager at HBOC and was responsible for managing the nationwide implementation of HBOC's contract with IKON. IKON hired a National Account Relationship Manager, Duane DeLoach, to work with Davis as her primary point of contact. Davis was very happy with DeLoach's performance and with IKON's. According to Defendant, Plaintiff Schuman had no involvement in the negotiation or implementation of IKON's contract with HBOC. According to Plaintiff, however, it was Brenda Peach who recommended that HBOC use IKON in the first place, based in part on her experience with Plaintiff. (Deposition of Brenda Peach ("Peach Depo.") at 24:19–25:12.) At Peach's request, Plaintiff reviewed the HBOC contract.

In late 2001, Plaintiff was informed that the McKesson account would be reassigned to the West Bay Marketplace, consistent with the policy that accounts should be serviced from the Marketplace in which they are located.[2] Plaintiff objected and sought assistance from his longtime contact person at McKesson, Brenda Peach. Peach wrote a lengthy email to IKON on Plaintiff's behalf, praising Plaintiff's service and suggesting that if Plaintiff were removed from the account, IKON would lose the "leg up" it had on competitors who would be vying for the new national account agreement McKesson was considering. (Declaration of Stephen Murphy ("Murphy Decl."), Ex. H.) Peach did not intend the letter to threaten IKON that it would not be selected as a vendor if Schuman were taken off the account. (Peach Depo. at 68:9–25.) IKON decided to keep Schuman on the account.

In late 2001, McKesson Corporation had decided it wanted a single nationwide provider for all of McKesson's and its subsidiaries' office equipment and services needs. Among the members

---

[2] Plaintiff claims that the policy did not apply to him because he had account assignments, not territory assignments, and that, in any event, the policy was not uniformly followed by IKON.

3

of the McKesson team who handled the Request for Proposals ("RFP") process were Davis, who brought to the process her experience with the HBOC-IKON contract, and Brenda Peach. McKesson's RFP was sent to Steve Henderson at IKON. IKON put together a team to prepare a response to the RFP and again, Henderson was the team leader. Defendant claims that the 2002 RFP process mimicked the process IKON used in securing the HBOC contract in 2000.

Plaintiff claims, however, that he was integrally involved in the 2002 RFP process (whereas he had not been involved in the 2000 contract negotiations). He says he was responsible for coordinating all communication between McKesson, IKON and Accenture (McKesson's project manager), was involved in all the meetings and conference calls for the team throughout the process, and interacted regularly with decision-makers at McKesson. (Declaration of Rodney Schuman ("Schuman Decl."), ¶ 5.) Indeed, in its proposal, IKON reported that DeLoach would be the National Account Relationship Manager if IKON were awarded the contract and that Schuman would be the Strategic Account Manager and the "primary point of contact." (Murphy Decl., Ex. J at 3, 7, 22.) IKON "propose[d] to continue the services of Rodney Schuman as McKesson's dedicated project manager . . . [as he ] has built a relationship of diligence and trust with McKesson's corporate headquarters." (*Id*. at 22.) Henderson admitted in deposition that the company "probably positioned" Plaintiff to "appeal to his contact, Brenda Peach." (Deposition of Steve Henderson at 53:13–21.) According to Plaintiff, his positive relationship with Peach, "nurtured over more than a dozen years," gave IKON an edge in the RFP process. According to Peach, senior management had become interested in pursuing a nationwide vendor arrangement due to McKesson's attractive pricing with IKON through Schuman. (Peach Depo. at 21:5–19.) From Peach's point of view, it was a benefit that Schuman would be on the national account management team because he had a "very broad, in-depth knowledge of the McKesson Drug Company, which was a huge part of th[e] whole RFP process. And he brought a very strong knowledge base." (*Id*. at 36:16–37:2.) It was Peach's understanding that Plaintiff would continue to service the account. (*Id*.

4

at 45:17–20.)[3]

In May 2002, IKON was awarded the contract because it offered the best product for the best price. The McKesson National Contract, signed in August, anticipated, but did not guarantee, that McKesson would purchase $10 million in products and services from IKON over a five-year period. Notwithstanding Ms. Davis' belief to the contrary, (*see* Deposition of Patricia Davis ("Davis Depo.") at 141: 4–7), the contract made clear that IKON was not to be McKesson's exclusive vendor. (Declaration of Rosemary Coyne-Hardman, Ex. A ("Each of us may enter into . . . agreements in the exercise of our sole discretion from time to time.")) Instead, commissions to IKON sales associates would accrue as individual sales to McKesson were made. When the award decision was made, Peach's role ended and Davis assumed responsibility for managing and implementing the 2002 contract. According to Defendant IKON, the implementation phase was "a major undertaking. It involved moving all of McKesson's offices, who were used to operating with a high degree of autonomy in procurement matters, to a centralized model, and not infuriating everyone in the process." (Motion at 7:28–8:2.) According to Defendant, "it was important to Davis not merely for IKON to provide equipment, but that IKON convey a sense of professionalism and a commitment to resolving problems collaboratively. Davis needed IKON to help her 'sell' the new arrangement to her internal clients – McKesson's offices and personnel across the country." (*Id*. at 8:5–8.)

Davis had had no contact with Schuman before the 2002 RFP process. Her initial impression of him was that he was not "very professional in either his demeanor or his appearance," nor was he "particularly articulate." (Davis Depo. at 59:22–62:1.) As she had more contact with him, she grew even more dissatisfied. According to Davis, Schuman was unreliable, unprofessional, and was not a strategic thinker. (*Id*. at 64:9–65:2.) He was "very argumentative and very negative about [McKesson's ability] to implement the solution that [it] had contracted with IKON to – to implement." (*Id*. at 80:11-81:1.) Schuman refused to recognize Davis' authority and continued to

---

[3] For the period between the RFP and the award of the contract, McKesson froze the placement of all orders with IKON. Plaintiff continued to work on orders in anticipation of the signing. According to Plaintiff, this meant that Plaintiff lost a large part of his income during this period but expected to make it up once the contract was signed.

5

work with Peach. (*Id*. at 86:13–87:19.) Davis repeatedly complained to Henderson, DeLoach, and others at IKON about Schuman's conduct and professionalism, suggesting that he was hindering the process rather than helping it. Plaintiff claims that he was never informed of Davis' complaints.

Ultimately, on August 15, 2002, Davis insisted, in writing, that Schuman be removed from the McKesson account. In September, Bill Crowley, Plaintiff's McKesson account supervisor, met with Davis to discuss her request. Crowley made no effort to convince Davis to continue working with Plaintiff despite his satisfaction with Plaintiff's performance on the McKesson account. (Deposition of Bill Crowley at 269:13–18, 240:9–20.) Plaintiff was not told of Davis' request, was never coached, and was not given any opportunity to correct his deficiencies. Ultimately, IKON honored McKesson's demand and replaced Schuman with Rosemary Coyne-Hardman on October 1, 2002. Plaintiff was not informed that he had been replaced until October 11, 2002. Schuman was paid 30% of the commissions on McKesson sales for the next six months after he was replaced.

On July 30, 2003, Plaintiff filed suit against Defendant IKON. In his first cause of action, for breach of express contract, Plaintiff alleges that IKON breached the compensation plans from 2002 to 2004, and IKON's contract with McKesson, by removing him from the McKesson account and not paying him earned commissions. In his second cause of action, Plaintiff alleges that IKON breached an implied contract not to take accounts away without good cause; to resolve any alleged problems before removing him from the account; and to assign him to a replacement account of equal value. In his third cause of action, Plaintiff claims that IKON breached the covenant of good faith and fair dealing. Plaintiff's fourth cause of action alleges that IKON violated California's Unfair Competition Law, California Business and Professions Code §§ 17200, *et seq*. At the heart of each of Plaintiff's claims is his belief that he should not have been removed from the McKesson account and is owed related commissions because the contract was "the culmination of [his] many years of hard work and excellent service to McKesson." (Schuman Decl., ¶ 13.)

## LEGAL STANDARD

The summary judgment procedure is a method for promptly disposing of actions. *See* FED. R. CIV. P. 56. The judgment sought will be granted if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "[A]

6

1  moving party without the ultimate burden of persuasion at trial [ ] may carry its initial burden of
2  production by either of two methods.  The moving party may produce evidence negating an essential
3  element of the nonmoving party's case, or, after suitable discovery, the moving party may show that
4  the nonmoving party does not have enough evidence of an essential element of its claim or defense
5  to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz*
6  *Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the movant meets its burden, the nonmoving
7  party must come forward with specific facts demonstrating a genuine factual issue for trial.
8  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

9  If the nonmoving party fails to make a showing sufficient to establish the existence of an
10 element essential to that party's case, and on which that party will bear the burden of proof at trial,
11 "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.
12 317, 323 (1986).  In opposing summary judgment, the nonmoving party may not rest on his
13 pleadings.  He "must produce at least some 'significant probative evidence tending to support the
14 complaint.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.
15 1987) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

16 The Court does not make credibility determinations with respect to evidence offered, and is
17 required to draw all inferences in the light most favorable to the non-moving party.  *See T.W. Elec.*
18 *Serv., Inc.*, 809 F.2d at 630-31 (citing *Matsushita*, 475 U.S. at 587 ).  Summary judgment is
19 therefore not appropriate "where contradictory inferences may reasonably be drawn from undisputed
20 evidentiary facts . . . ." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th
21 Cir. 1980).

**ANALYSIS**

23 Defendant argues that all four of Plaintiff's claims fall here because Plaintiff has failed to
24 established a genuine issue of material fact.  The Court agrees.

**A.     Plaintiff's Breach of Contract Claim**

26 In his First Cause of Action, Plaintiff alleges that Defendant breached the terms of the

7

applicable compensation plans by removing him from the McKesson account.[4]  Plaintiff contends that the provision in the compensation plans that gives Defendant claims gives it discretionary authority to change territory assignments does not apply to Plaintiff because, as an MAE, he services accounts, not territories.  Plaintiff also argues that even if that provision does apply to him, to the extent that the compensation plans allow Defendant to "arbitrarily remov[e] a sales representative from an account after a contract is secured," the plans are unconscionable.  (Opposition at 14.)  Finally, Plaintiff claims that because he was the "procuring cause" of the McKesson National Contract, he is entitled, pursuant to the compensation plan, to the payment of commissions, and that Defendant breached the plan by not paying him the commissions he earned.  Defendant contends that Plaintiff has failed to establish any genuine issue of material fact on this claim.  Defendant argues that the compensation plan, which governs Plaintiff's rights here, expressly authorizes IKON to remove a sales representative from an account at its discretion, and is not unconscionable.  Defendant also argues that the "procuring cause" doctrine does not apply here.

       **1.**       **The Compensation Plan Authorized Defendant IKON to Remove Plaintiff From the McKesson Account.**

Plaintiff's employment with IKON was at-will.  (Naftel Decl., Ex. E at 62.)  Pursuant to the compensation plan, IKON and Plaintiff were both free to terminate such employment at any time for any reason.  The plan also expressly authorized IKON to "change, cancel, expand or reduce the size, scope and type of any territory assignments to Sales Representatives at any time for any reason."  (*Id.*)  Plaintiff contends that as a Major Account Executive, he was assigned to *accounts* and not to *territories* such that the compensation plan provision which refers to "territory assignments" does not apply to him.  The Court disagrees.  The evidence before the Court establishes that the term "territory" refers to a sales representative's area of responsibility, whether that territory is geographic or is a territory of specific accounts.  Plaintiff's official job description lists his responsibilities as, *inter alia*: "manag[ing] territory by protecting and increasing a profitable revenue

---

[4] In his Complaint, Plaintiff also alleges that IKON breached the *IKON-McKesson* contract.  Because Plaintiff fails to address this claim in his opposition, the Court concludes that Plaintiff has abandoned this particular allegation.  Accordingly, the Court **GRANTS** summary judgment in Defendant's favor on Plaintiff's claim that the McKesson-IKON contract was breached when Defendant removed Plaintiff from the McKesson account.

stream within current accounts." (Cooke Reply Decl., Ex. A.)  Moreover, in the compensation plan's glossary, the "Territory Integrity" entry explains that the code of territory integrity applies to "Sales Representatives who sell in another's territory, **whether that territory is a geographical assignment or on a Major Account List** . . . ." (Naftel Decl., Ex. A at 55–60 (emphasis added).) Plaintiff has presented no evidence to support a finding that "territory assignments," as that phrase is used in the provision of the compensation plan authorizing IKON discretionary decision-making over territory assignments, is limited to geographic territory assignments.  Accordingly, the Court finds that the plan provision conferring discretionary authority in Defendant to make assignment decisions applies to Plaintiff.

      Having found that the plan provision applies to Plaintiff, the Court finds that Defendant did not exceed its authority or in any way breach the plan provision when it removed Plaintiff from the McKesson account.  The plan authorized such a discretionary decision and under California law, an employer is entitled to wide discretion in making business judgments. *See, e.g., Cotran v. Rollins Hudig Hall Int'l, Inc.*, 17 Cal. 4th 93, 101–102 (1998) (citation omitted).  Here, even though there is no requirement in the plan that Defendant have a reasonable justification for its assignment decisions, the Court notes that the evidence here demonstrates that Defendant's assignment decision was justified and reasonable. *Compare McCollom v. Xcare.net, Inc.*, 212 F. Supp. 2d 1142 (N.D. Cal. 2002) (where the court found that the compensation plan at issue did require the employer to establish a legitimate business reason for reassigning the account and then found the employer had not done so.)  The undisputed evidence here demonstrates that Patricia Davis, the McKesson contact in charge of implementing the national contract, repeatedly complained to IKON about Plaintiff, and that on August 15, 2003, she made a written request to IKON insisting that Plaintiff be taken off the account.  Plaintiff conceded, in deposition, that the compensation plan authorizes Defendant to remove an employee from an account based on a customer complaint. (Schuman Depo. at 352:13–18.)  Accordingly, Plaintiff has presented no evidence that would support a finding that Defendant somehow breached the compensation plan by complying with its customer's insistent request to remove Plaintiff from the McKesson account.

      **2.**      **The Compensation Plan Is Not Unconscionable**.

Plaintiff contends that the compensation plan permits Defendant to remove sales representatives from accounts after a contract is secured but before the customer is invoiced and that as such, it is unconscionable. An unconscionable agreement may be unenforceable. CAL. CIV. CODE § 1670.5. "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Ellis v. McKinnon Broadcasting Co.*, 18 Cal. App. 4th 1796, 1803 (1993). Thus, unconscionability has both a procedural and a substantive component. Procedural unconscionability exists where there is either an inequality in bargaining power "which results in no real negotiation and an absence of meaningful choice" or "surprise [because] the supposedly agreed-upon terms of the bargain are hidden . . . by the party seeking to enforce the disputed terms." *Id*. Substantive unconscionability exists where there is "an overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made." *Id*. While both components must be present before a clause or contract will be held unenforceable, "central to a determination of unconscionability is an assessment of the substantive reasonableness of the challenged provision [such that a] compelling case of substantive unreasonableness will overcome a relatively weak showing of procedural unconscionability." *Id*.

Plaintiff, here, contends that the plan provisions allowing Defendant to remove Plaintiff from the McKesson account and not pay him future commissions are both procedurally and substantively unconscionable. Plaintiff argues that the provisions are procedurally unconscionable because the compensation plan was a "take it or leave it" plan that allowed Plaintiff no opportunity to negotiate its terms. The Court finds that Plaintiff has created an issue of material fact in that regard. However, Plaintiff has not established that there is a triable issue of fact regarding whether the plan provision was *substantively* unconscionable. Plaintiff claims that because the plan provisions give IKON complete control over whether or not a sales representative will be permitted to service an account up until the time a customer is invoiced, the provision barring commissions except those flowing from already-invoiced sales is substantively unconscionable. Plaintiff cites the *McCollom* and *Ellis* cases to support its contention. *McCollom*, 212 F. Supp. 2d 1142; *Ellis*, 18 Cal. App. 4th 1796. For the reasons set forth below, the Court finds those cases inapposite on the current record.

10

In *McCollom*, the plaintiff was terminated just two weeks before a $10 million sales contract, which she had negotiated, was signed. In accordance with the compensation plan's forfeiture clause, the terminated plaintiff was denied the nearly $600,000 in commissions she would have earned on the contract. In *Ellis*, the plaintiff voluntarily left the defendant's employ and soon thereafter learned that the defendant employer collected nearly $100,000 in fees on advertising previously sold by Ellis. In accordance with the compensation plan in force, the $20,000 commission that Ellis would have collected was forfeited because the sales receipt was collected after he quit. In those cases, the courts found the forfeiture provisions at issue were unconscionable because they allowed the employer to eliminate any obligation to pay already-earned commissions simply by unilaterally and arbitrarily reassigning the account prior to payment of the commission. The forfeited commission in those cases accrued to the employer as a result of the termination instead of to the terminated sales representative who had done all the work to acquire the contract.

The facts are quite different here. First, and most importantly, as discussed above, the contract at issue here, the McKesson National Contract, is different from the contracts at issue in *McCollom* and *Ellis* because it generated no revenue, but instead paved the way for sales representatives to attempt sales at a pre-negotiated price. No revenue directly sprang from the national contract and no commissions were earned. Second, Plaintiff has presented no evidence that Defendant *arbitrarily* reassigned the McKesson account; instead, unlike in *McCollom*, Plaintiff was removed from the account at the express insistence of the client itself. Finally, the commissions Plaintiff maintains he was not paid did not revert to IKON as they did in the *McCollom* and *Ellis* cases.[5] Because the facts here are substantially different from the facts that the *McCollom* and *Ellis* courts found significant in holding that the contracts at issue might be substantively unconscionable, the Court finds that Plaintiff's reliance on those cases is misplaced, and that Plaintiff has not demonstrated that the plan provision at issue here imposed "an overly harsh allocation of risks or costs" on him such that it could be said to be substantively unconscionable.

---

[5] In fact, 30% of the commissions on the first six months of sales made pursuant to the national contract, on which Plaintiff did not work at all, were paid to Plaintiff. The remaining 70% were paid to his replacement.

11

### 3. The Compensation Plan Did Not Require Defendant to Pay Plaintiff Commissions on McKesson Sales Indefinitely.

Having established that the compensation provisions at issue applied to Plaintiff and were not unconscionable, the Court now turns to whether Defendant breached the plan by not paying Plaintiff commissions on McKesson sales indefinitely. Pursuant to the compensation plan, if a sales representative is terminated, "whether by resignation or discharge, and whether with or without cause, compensation for deals where the customer has been invoiced, but not paid at the time of the employee's termination will be paid to the Sales Representative following termination." (Naftel Decl., Ex. E at 61.) Plaintiff claims that this language contractually binds Defendant to pay him commissions on any McKesson sales made pursuant to the McKesson National Contract indefinitely, even after he no longer serviced the account. The Court disagrees. The contract language here unambiguously requires Defendant to pay Plaintiff commissions on any outstanding McKesson sales but does not require Defendant to pay Plaintiff commissions on sales not yet made. Moreover, Plaintiff even acknowledged in deposition that a commission was not earned until the sales agreement was approved and executed, the equipment was installed, and the customer was invoiced. (Schuman Depo. at 327:2–12.) As discussed *supra*, the McKesson National Contract did not involve any orders for specific supplies or services, but merely locked IKON into a pricing scheme that was beneficial to McKesson and that put IKON in the advantageous position of serving as McKesson's preferred office supplies and services vendor. It would be up to IKON's sales representatives to realize and maximize the sales opportunity. (Deposition of Carl Albrecht ("Albrecht Depo.") at 72:12–17.) Accordingly, the contract was not itself a sale and never itself generated any revenue; the contract merely gave IKON permission to try to make sales which would then generate revenue. Plaintiff made no sales under the national agreement and he has provided no evidence that he was denied commissions on McKesson sales he initiated that had been invoiced but not yet paid in violation of the compensation plan, nor does he provide any evidence that the plan provision would require IKON to pay Plaintiff commissions for future sales he did not make.

### 4. The Procuring Cause Doctrine Does Not Apply Here.

Citing *Willson v. Turner Resilient Floors*, 89 Cal. App. 2d 589 (1949), Plaintiff claims that he was the "procuring cause" of the McKesson National Contract, and that as such, he is entitled to

commissions on all future McKesson sales under the contract. The *Willson* case and the case it relied upon, *Brea v. McGlashan*, 3 Cal. App. 2d 454 (1934), stand for the proposition that "if an agent . . . is the inducing or procuring cause of the contract, he is entitled to the commission, even though the principal takes it out of his own hand and completes it." *Brea*, 3 Cal App. 2d at 465–66. The Court finds that the *Willson* case is distinguishable from the case at bar on its facts and does not support the conclusion urged by Plaintiff here.

In *Willson*, the plaintiff, a salesman, worked on commission for a floor covering company. He procured a substantial sale and then when he resigned, the commissions from the sale were denied him by the employer because the president of the company had ultimately consummated the transaction. The court found that "where the agent is the procuring cause of the transaction which he was authorized to negotiate he is entitled to his commission irrespective of the fact that the principal himself, or through others, may have intervened and actually completed the final act of the negotiation." 89 Cal. App. 2d at 595. Here, even assuming, *arguendo*, that Plaintiff was the procuring cause of the McKesson National Contract (which is highly debatable), that contract was *not* a sale on which Plaintiff would be owed any commissions. It was a preferred vendor agreement locking in advantageous pricing for McKesson. IKON sales representatives were invited, under the contract, to attempt to make sales consistent with the contract's pricing terms, but no revenue was earned under the contract itself and no commissions were paid to anyone. Plaintiff has failed to demonstrate that he was the procuring cause of any subsequent actual *sales* made by other IKON personnel pursuant to the terms of the national contract. Had he stayed on at IKON, Plaintiff would have been entitled only to the commissions relative to any specific sales he made under the terms of the national contract and none other. If other IKON sales representatives made sales according to the contract's terms, Plaintiff would not have been entitled to their commissions. To the extent that Plaintiff had any expectations that he would earn commissions directly from the McKesson National Contract, those expectations were unreasonable. Accordingly, *Willson*'s procuring cause doctrine does not help Plaintiff here.

—

Because the provision conferring discretionary authority in IKON for account assignment

decisions applies to Plaintiff, because the compensation plan is not unconscionable, because Plaintiff has produced no evidence to support a finding that Defendant breached the compensation plan, and because the *Willson* "procuring cause" doctrine does not apply here, the Court **GRANTS** summary judgment in Defendant's favor on Plaintiff's First Cause of Action for breach of contract.

**B.      Plaintiff's Breach of Implied Contract Claim**

Plaintiff neglects to address Defendant's arguments in favor of summary judgment on his Second Cause of Action for the breach of various implied contracts. Accordingly, Plaintiff has conceded this claim. The Court therefore **GRANTS** summary judgment in Defendant's favor on Plaintiff's Second Cause of Action.

**C.      Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing**

The implied covenant of good faith and fair dealing is inherent in every contract. *Logan v. San Francisco Federal Savings & Loan Assoc.*, 1998 U.S. Dist. LEXIS 10517 (N.D. Cal. 1998). However, the scope of implied covenant claims is very limited in the employment context. *See, e.g., Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 353 (2000). Where breach of an actual contract term is alleged, a separate implied covenant claim, based on the same breach, is superfluous. *Id.* at 327. And "where an implied covenant claim alleges a breach of obligations beyond the agreement's actual terms, it is invalid." *Id*. However, "[t]he covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled." *Id*. at 353 n. 18; *see also McCollom*, 212 F. Supp. 2d at 1152 ("if one party exercises its discretionary authority in bad faith for the purpose of frustrating the other party's legitimate expectations, it has breached the implied covenant.")

Here, relying on *McCollom*, Plaintiff alleges that Defendant violated the implied covenant by failing to exercise the discretionary re-assignment power it held, pursuant to the compensation plan, in good faith.[6] Unlike *McCollom*, however, Plaintiff has failed to provide any evidence that would support a finding that Defendant exercised its discretion (by removing Plaintiff from the McKesson

---

[6] The other cases Plaintiff relies upon here are inapposite as none involves an employment contract. *See Floystrup v. City of Berkeley Rent Stabilization Board*, 219 Cal. App. 3d 1309 (1990) (landlord-Rent Stabilization Board agreement); *Kendall v. Ernest Pestana, Inc.*, 40 Cal. 3d 488 (1985) (lease); *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496 (2001) (real estate transaction).

14

account) in bad faith or that it did so "for the purpose of frustrating [Plaintiff's commission] expectations."

In *McCollom*, the court declined to adjudicate the plaintiff's implied covenant claim on summary judgment, finding that there were disputed questions of fact regarding whether the employer's discretionary removal of the employee from the account was "intended to frustrate [the] plaintiff's legitimate expectations" under the compensation plan. 212 F. Supp. 2d at 1153. There, the plaintiff was responsible for the FHS account and led the effort to consummate a two-year agreement that would have resulted in $10 million in revenue for the employer. The plaintiff was terminated two weeks before the contract was signed and was denied the commission that resulted from the contract. To justify its decision, the employer claimed that the client had complained about her, as Defendant does here. However, in *McCollom*, other than the defendant's allegations, there was no evidence of client complaints, suggesting to the court that the client-complaint justification was fabricated to prevent the plaintiff from earning her commission. Additionally, the defendant employer kept the commission that the plaintiff would have received but for her termination. Here, to the contrary, Plaintiff has presented no evidence that Defendant IKON took Plaintiff off the McKesson account in bad faith or *intending* to deny him McKesson-related commissions. First, the evidence demonstrates that the client complaints were real and recurring. Second, IKON did not keep the McKesson commissions, but instead gave Plaintiff 30% of the commissions for six months after he left and gave the rest to the employee who replaced him on the account and actually worked on the sales that generated revenue. Moreover, the evidence does not support a finding that Plaintiff's expectations here were legitimate. Nothing in the Compensation Plan suggests that Plaintiff should have expected to be kept on an account indefinitely despite client complaints or that his supervisors would, in the event of a client complaint, coach him to improve before re-assigning him. In sum, this is a wholly different factual scenario from the *McCollom* case. Defendant's decision, in the face of McKesson's complaints about Plaintiff, to remove Plaintiff from the account without first developing an improvement plan, does not reflect an intent to frustrate Plaintiff's legitimate expectations. Therefore, the Court **GRANTS** summary judgment in Defendant's favor on Plaintiff's claim for a breach of the implied covenant of good faith and fair dealing.

**D.     Plaintiff's § 17200 Claim**[7]

Plaintiff claims that Defendant committed unlawful business practices, subject to redress under California Business and Professions Code § 17200, when it took the McKesson account away from Plaintiff at the client's request and deprived him of commissions he alleges he earned on that account.[8] To show that a business practice is unlawful under the Unfair Competition Law, a plaintiff must show that the practice is prohibited by statute or regulation. *Stop Youth Addiction v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 566 (1998). Here, as discussed above, Plaintiff has failed to demonstrate that Defendant violated the compensation plan or the implied covenant of good faith and fair dealing when it removed Plaintiff from the McKesson account. Plaintiff has also failed to demonstrate that the compensation plan could be found unconscionable. Accordingly, without any "unlawful" predicate for his section 17200 claim, that claim must fail.

With respect to the fairness prong of a UCL claim, the Court first notes that courts have been wary of becoming the arbiters of fairness where the action at issue does not violate a statute or contract. "An undefined standard of what is 'unfair' fails to give businesses adequate guidelines as to what conduct may be challenged and thus enjoined and may sanction arbitrary or unpredictable decisions about what is fair or unfair." *Cel-Tech Comm., Inc. v. Los Angeles Cellular Telephone*, 20 Cal. 4th 163, 185 (1999). Even if the Court were inclined to wade into a fairness analysis, however, the Court notes that, as discussed *supra*, the evidentiary record supports a finding that Defendant's decision to comply with its important client's demand that Plaintiff be removed from the account was not unreasonable. Moreover, Defendant's decision to compensate Plaintiff, to the tune of 30% of all commissions on McKesson sales for the next six months, was exceedingly "fair."

The Court **GRANTS** summary judgment on Plaintiff's section 17200 cause of action in Defendant's favor.

---

[7] Due to the passage of Proposition 64, an individual can no longer maintain a representative action for violation of section 17200. Accordingly, to the extent that Plaintiff's Fourth Cause of Action alleges such a representative claim, the Court **GRANTS** summary judgment in Defendant's favor.

[8] In his Complaint, Plaintiff also alleges that Defendant violated section 17200 by "changing the commission structures" and "assessing chargebacks on commissions earned by salespersons." (Complaint at ¶ 34.) Plaintiff conceded in his deposition that he has no reason to pursue these particular allegations. (Schuman Depo. at 372:22–373:14, 381:4–23.)

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**.

This Order terminates docket entry no. 37.  The Clerk of Court shall close the file.

**IT IS SO ORDERED.**

Dated: May_10__, 2005

/s/
MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

